IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL WESLEY,

Plaintiff,

v.

DR. GULICK, Nurse BUTLER, Male Nurse
Doe, NURSE NEIL, DR. STEVEN
SHELTON, Nurses Jane and John Does 1-10,

Defendants.

Case No. 3:15-cv-00440-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, Magistrate Judge.**

Plaintiff Michael Wesley ("Wesley") is an inmate in the custody of the Oregon

Department of Corrections ("ODOC"), currently housed at Snake River Correctional Institution

("SRCI"). Wesley brings two claims against fifteen ODOC employees: Dr. Garth Gulick ("Dr.

Gulick"), Registered Nurse ("R.N.") Rebecca Butler ("Nurse Butler"),[1] R.N. Karen Neil ("Nurse

---

[1] Plaintiff named Nurse Butler in the complaint because she was one of the nurses
working in the SRCI infirmary on March 27, 2013, and the handwriting on the chart notes was
illegible. Nurse Neill was later identified as the nurse who replaced Wesley's catheter on March
27, 2013, not Nurse Butler.

PAGE 1 – FINDINGS AND RECOMMENDATION

Neill"),[2] Dr. Steven Shelton ("Dr. Shelton"), and eleven unnamed Doe nurses (collectively, "Defendants"). Wesley brings his first claim pursuant to 42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Wesley also brings a state law claim for medical negligence, premised on the same underlying conduct.

Defendants now move for summary judgment on both of Wesley's claims. *See* FED. R. CIV. P. 56. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. For the reasons that follow, the Court recommends that the district judge grant Defendants' motion for summary judgment.

## FACTUAL AND PROCEDURAL HISTORY

This case concerns actions that occurred during Wesley's incarceration at Two Rivers Correctional Institution ("TRCI") between December 2009 and June 2010, and at SRCI after June 2010. (Shelton Decl. ¶ 3.) Dr. Gulick is SRCI's Chief Medical Officer and is one of several physicians who treated Wesley at SRCI. (Burrows Decl. Ex. 28, at 3-4.) Nurse Neill is an R.N. at SRCI. (Burrows Decl. Ex. 30, at 13.) Dr. Shelton is ODOC's Medical Director. (Burrows Decl. Ex. 32, at 2.) In his official capacity, Dr. Shelton provides final approval for decisions regarding medical care, treatment, and accommodations brought before ODOC's Therapeutic Levels of Care ("TLC") committee.[3] (Pl.'s Resp. Mot. Summ. J. at 43.)

---

[2] The complaint and various filings spell Nurse Neill's surname incorrectly. The Court uses the correct spelling "Neill," as reflected in Nurse Neill's deposition and on her Oregon State Board of Nursing license.

[3] ODOC maintains a "Level of Therapeutic Care" policy that assigns varying levels of medical necessity to inmates' requests for medical treatment or comfort care. This policy requires that an inmate—or their physician—submit a TLC form. A TLC committee reviews the form. The TLC policy is relevant to this action because it "establishes the method and guidelines used to determine whether treatment will or will not be provided," and "ensure[s] that sufficient

In September 2008, Wesley began his current period of incarceration at the Lane County Jail. In December 2009, he transferred to ODOC's custody. Wesley suffered physical trauma from multiple gunshot wounds immediately prior to being taken into custody, and he learned "how to be a paraplegic" at the Lane County Jail. (Wesley Decl. ¶¶ 3, 5.) Among other injuries, he suffered an injury at the T4/T5 vertebral level and lost three fingers on his left hand. (Wesley Decl. ¶ 3.) Wesley is a T4/T5 paraplegic secondary to his spinal injury. He experiences no feeling or muscle control from roughly the midpoint of his sternum down to his toes, and he cannot feel pain below the T4/T5 level. (Wesley Decl. ¶¶ 4-5.)

Wesley suffers from frequent involuntary bladder spasms, which makes complete elimination of waste challenging. (Wesley Decl. ¶¶ 4-5, 34; Burrows Decl. Ex. 22, at 1.) Waste retention can cause secondary injuries due to urinary tract infections, renal damage, or symptomatic autonomic dysreflexia. (Burrows Decl. Ex. 22, at 1; Wesley Decl. ¶¶ 6-8.) Autonomic dysreflexia can occur in anyone who has a spinal cord injury at T6 or above. (Shelton Decl. ¶ 5.) It is caused by a disconnection between the organs below the level of injury and the control mechanisms for those organs above the level of injury. (*Id.*) Symptomatic autonomic dysreflexia includes severe hypertension associated with throbbing headaches, blurred vision, profuse sweating, skin flushing, apprehension, and anxiety. (*Id.*) If left untreated, autonomic dysreflexia can lead to stroke, retinal hemorrhage, pulmonary edema, and, in rare instances, death. (Burrows Decl. Ex. 22, at 1; Wesley Decl. ¶¶ 6-8.) Thus, it is important that Wesley keep his bladder as empty as possible.

Wesley was self-catheterizing every four to six hours during his initial trauma recovery. (Wesley Decl. ¶ 6.) Since Wesley's missing digits inhibit his manual dexterity, self-

---

health care resources are available to fulfill the Department's policy of preserving and maintaining [an] inmate's health status during incarceration." (Burrow Decl. Ex. 41, at 1.)

PAGE 3 – FINDINGS AND RECOMMENDATION

catheterization proved to be quite difficult, and did not guarantee a completely empty bladder. (Wesley Decl. ¶ 8.) In April 2009, Wesley had surgery to create a stoma[4] and began utilizing an indwelling suprapubic Foley catheter, size 16 French[5] ("fr."), so that his bladder would empty continuously. (Shelton Decl. ¶ 11; Wesley Decl. ¶ 9.)

Wesley arrived at TRCI on December 29, 2009. He had his first scheduled catheter change at TRCI in early January 2010. TRCI did not have a size 16 fr. Foley catheter on hand, but nothing abnormal occurred during this particular catheter change. (Wesley Decl. ¶ 19.)

On February 4, 2010, Wesley went to TRCI's infirmary for a scheduled catheter change. (Wesley Decl. ¶ 21.) Per the ODOC chart notes, the catheter would not come out through the tunnel easily. (Shelton Decl. Attach. 1, at 54.) Medical staff eventually removed the catheter, pulling with significant force. (*Id.*) Resulting trauma occurred to the stoma and bladder tissue, and bleeding occurred. (*Id.*) Staff placed a new 18 fr. catheter. (*Id.*) Almost three hours after the catheter was replaced, Wesley returned to the infirmary because he still had no urinary return. (Shelton Decl. ¶ 14.) Medical staff irrigated the bladder, but were unable to get any return flow through the suprapubic catheter because dried blood blocked the tubing. (Shelton Decl. Attach. 1, at 54.) Medical staff then attempted to drain the bladder through a urethral catheter, but were unsuccessful. (*Id.*)

Accumulated urine distended Wesley's bladder, which triggered an onset of autonomic dysreflexia. (Burrows Decl. Ex. 26, at 2.) Wesley's blood pressure spiked to a dangerously high

---

[4] "A stoma is a surgically created opening to the bladder through the abdominal wall." *Hoffman v. Quach*, No. 2:14-cv-1009 MCE DB P, 2017 WL 840660, at *4 (E.D. Cal. Mar. 3, 2017).

[5] "Catheter size is measured by diameter using the French scale." *Hoffman*, 2017 WL 840660, at *4.

PAGE 4 – FINDINGS AND RECOMMENDATION

level. His skin became flushed, and he was short of breath and visibly shaking. (Wesley Decl. ¶¶ 22-23.) Within minutes, an ODOC nurse practitioner administered nitroglycerin tablets to bring Wesley's blood pressure down. (Burrows Decl. Ex. 26, at 1-2.) Shortly thereafter, Wesley was transported by ambulance to the emergency department at Good Shepherd Hospital. (Burrows Decl. Ex. 27, at 2.) An emergency room physician evaluated Wesley, flushed his bladder of any coagulated blood, and replaced the catheter. (Burrows Decl. Ex. 27, at 2.) Wesley's symptoms resolved, and he was transported back to TRCI. (Burrows Decl. Ex. 27, at 1.) In December 2010, Wesley filed grievances against the prison nursing staff and a complaint with the Oregon Board of Nursing regarding this incident. (Wesley Decl. ¶ 28.)

Wesley's next catheter change was scheduled for March 4, 2010. (Burrows Decl. Ex. 16, at 1.) Wesley initially refused to have his catheter changed at TRCI's infirmary, stating that he had an Inmate Communication Form, also known as a "kyte,"[6] approving him to see a urologist for catheter changes. (Burrows Decl. Ex. 17, at 1.) Wesley ultimately attended the appointment, and the catheter change was unremarkable. (Shelton Decl. Attach. 1, at 52.) The next catheter change was delayed until April 20, 2010, because the necessary catheter was unavailable at the time originally scheduled. (Shelton Decl. Attach. 1, at 50.) The following month's catheter change occurred without incident on May 20, 2010. (Shelton Decl. Attach. 1, at 49.)

On May 23, 2010, Wesley visited the infirmary complaining of headaches and muscle spasms. (Shelton Decl. Attach. 1, at 49.) Wesley states in his declaration that his urine was not draining, and that medical staff neglected to give him a new catheter. (Wesley Decl. ¶ 32.) However, ODOC chart notes document that the catheter was intact and draining, and did not require a replacement. (Shelton Decl. Attach. 1, at 49.)

---

[6] The kyte is not included in the summary judgment record.

PAGE 5 – FINDINGS AND RECOMMENDATION

On May 26, 2010, Wesley returned to the infirmary due to spasms, fever, and pain, and medical staff obtained a urinalysis test. (Shelton Decl. ¶ 16.) On June 2, 2010, Dr. Greg Lytle ("Dr. Lytle"), an ODOC physician, diagnosed Wesley with a urinary tract infection. (Shelton Decl. ¶ 18.) Dr. Lytle treated Wesley with Ciprofloxin antibiotics, even though Wesley's chart indicates that this is a known drug allergen, because Ciprofloxin is one of only two antibiotics available to treat the two types of bacteria cultured from Wesley's urine analysis test. (*Id.*) After prescribing the antibiotics, Dr. Lytle monitored Wesley for signs of an allergic reaction. (*Id.*) Wesley completed his treatment for the urinary tract infection without any documented allergic reaction or adverse outcome. (*Id.*)

On June 10, 2010, Wesley was transferred from TRCI to SRCI. (Shelton Decl. ¶ 19.) Wesley underwent routine catheter changes without incident on June 21, 2010, July 7, 2010, and August 5, 2010 at SRCI's infirmary. (Shelton Decl. Attach. 1, at 44-45.) On August 23, 2010, Wesley presented for a urology consultation with Dr. Eric Klein ("Dr. Klein") at the Idaho Urologic Institute. (Shelton Decl. ¶ 20.) Dr. Klein recommended a change in medications to address infectious processes associated with indwelling catheters. (Burrows Decl. Ex. 39, at 5.) Dr. Klein also changed Wesley's catheter at that visit, and prescribed monthly catheter changes that "can certainly be done at the correctional institution." (*Id.*)

Wesley's next catheter change was scheduled for September 2, 2010. Wesley presented to the SRCI infirmary, and it is unclear from the notes whether the catheter change occurred. ("P[atien]t here for cath[eter] [change] & p[atien]t states his cath[eter] was [changed] at Dr. Klein visit last week.") (Shelton Decl. Attach. 1, at 43 (9/2/10); Wesley Decl. ¶ 30.) Between October 2010 and March 2013, Wesley asserts that he received defective catheters six or seven times, and that the catheters would fall out due to poor inflation of the balloon. However,

PAGE 6 – FINDINGS AND RECOMMENDATION

Wesley's chart documents only the following three infirmary visits of note that occurred outside of his regularly scheduled catheter changes:

    1)    On October 16, 2010, Wesley reported that his catheter was not draining properly. The catheter was irrigated, and the balloon was deflated. Medical staff noted that it was in the proper location, and that it moved easily in and out through the stoma. The catheter was not changed because it was functioning. (Shelton Decl. ¶ 21; *Id.* Attach. 1, at 43.)

    2)    On January 16, 2011, Wesley again reported that his catheter was not draining properly. When the catheter was irrigated, red particles were detected in Wesley's urine, showing a possible blockage from dried blood. Medical staff changed Wesley's catheter later that day. (*Id.* at 40.)

    3)    On May 21, 2012, Wesley again reported that his catheter was not draining properly. Medical personnel changed Wesley's catheter at that time without incident. (*Id.* at 26.)

    Wesley also asserts that medical staff intentionally scheduled his catheter changes six or seven weeks apart, instead of the monthly changes prescribed by Dr. Klein, and that this caused him to have frequent urinary tract infections. (Wesley Decl. ¶¶ 30, 32-35.) However, Wesley's chart documents monthly scheduled catheter changes that Wesley tolerated without incident. (Shelton Decl. Attach. 1, at 43 (10/12/10); *Id.* at 42 (11/6/10); *Id.* at 41 (12/25/10); *Id.* at 40 (1/16/11), (2/21/11); *Id.* at 37 (3/25/11); *Id.* at 36 (4/25/11); *Id.* at 35 (5/25/11); *Id.* at 34 (6/25/11); *Id.* at 33 (7/25/11); *Id.* at 32 (8/25/11), (9/25/11); *Id.* at 31 (10/25/11); *Id.* at 30 (11/25/11); *Id.* at 29 (12/23/11); *Id.* at 28 (1/27/12); *Id.* at 27 (3/27/12), (4/27/12); *Id.* at 26 (5/21/12); *Id.* at 25 (6/21/12); *Id.* at 24 (7/21/12), (8/21/12); *Id.* at 23 (9/21/12) *Id.* at 22 910/21/12); *Id.* at 21 (11/21/12), (12/21/12), (1/21/13); *Id.* at 20 (2/21/13), (3/21/13).) During this time frame, Wesley's chart also documents numerous other infirmary visits for diagnostic

imaging, medication management, and various symptomatic issues, including occult blood in stool, diarrhea, anemia, and muscle spasms. According to Wesley's medical records, ODOC medical personnel diagnosed and treated these symptoms in a timely manner as they occurred. (*See generally* Shelton Decl. Attach. 1, at 20-43.)

On March 27, 2013, Wesley presented at the infirmary because an earlier-placed catheter began leaking urine from the stoma site and through the urethra. (Wesley Decl. ¶ 40.) Nurse Neill removed the leaking catheter. (Shelton Decl. Attach. 1, at 19.) Wesley alleges that Nurse Neill did not use new gloves between removing the old catheter and handling the new catheter. (Wesley Decl. ¶¶ 43, 45.) He also alleges that she failed to test the catheter balloon prior to insertion to make sure that it would inflate. (Wesley Decl. ¶ 43.) Nurse Neill inserted the catheter into the stoma. (Burrows Decl. Ex. 30, at 14:15-16; Wesley Decl. ¶¶ 43, 45.) Wesley alleges she pushed hard on the syringe. (Burrows Decl. Ex. 30, at 16:8-17; Wesley Decl. ¶ 46.) The balloon only accepted four cubic centimeters of saline, instead of the six cubic centimeters normally required to inflate the balloon. (Burrows Decl. Ex. 30, at 32-33; Shelton Decl. Attach. 1, at 19.) Nurse Neill attached the leg bag and noted in Wesley's chart "clear/light yellow urine draining into bag." (Burrows Decl. Ex. 30, at 16; Shelton Decl. Attach. 1, at 19.) Three hours later, Wesley noticed that no urine was draining from the catheter into his leg bag. (Wesley Decl. ¶ 54.) He began to leak urine from his penis and stoma, felt flushed and hypertensive, and returned to the infirmary. (Wesley Decl. ¶¶ 54-55.)

The nurse staffing the infirmary, Chris Kimball ("Nurse Kimball"), confirmed that the catheter was not draining. For twenty-five minutes, Nurse Kimball attempted to remove the catheter but could not get the balloon to deflate, flush, or drain. (Wesley Decl. ¶¶ 55-56; Shelton Decl. Attach. 1, at 19.) Nurse Kimball attempted to contact Dr. Eric Uhlman ("Dr. Uhlman"), a

local urologist. (Shelton Decl. ¶ 25.) Nurse Kimball then consulted with Dr. Gulick, who recommended that Wesley be transported to the emergency department at Saint Alphonsus Medical Center ("SAMCO") in Ontario, Oregon. (Wesley Decl. ¶ 57; Shelton Decl. Attach. 1, at 19.)

SAMCO medical personnel performed a medical evaluation, and then attempted to remove the catheter, but with no success. (Wesley Decl. ¶ 60.) Computed tomography ("CT") imaging of Wesley's pelvis concluded that there was an "acute high grade left renal obstruction secondary to iatrogenic malpositioned suprapubic catheter," and that "the distal tip [was] positioned within the distal left ureter." (Shelton Decl. Attach. 1, at 66.) The misplaced catheter tip was stuck and blocking Wesley's left ureter, and this was putting pressure on his right kidney, causing symptomatic autonomic dysreflexia. (Burrows Decl. Ex. 18, at 1-2; *Id.* Ex. 25, at 1.) Upon stabilization, guards transported Wesley back to SRCI's infirmary, where he spent the night in pain and without his medically issued pillows for spine and leg support. (Wesley Decl. ¶ 54.) The following morning, guards transported Wesley to Dr. Uhlman's clinic in Boise, Idaho, where Wesley underwent outpatient ureteroscopic surgery to remove the failed catheter.[7] (Wesley Decl. ¶¶ 71-73; Shelton Decl. ¶ 26.) Wesley's recovery from the procedure was unremarkable with the exception of scrotal swelling, which resolved with medication. (Shelton Decl. Attach. 1, at 11-13.)

---

[7] An ureteroscopy is an outpatient procedure in which a small scope is inserted into the bladder and ureter. The scope can be used to puncture a catheter's balloon using a small wire. (Shelton Decl. ¶ 26.)

PAGE 9 – FINDINGS AND RECOMMENDATION

In the two years that preceded the filing of Wesley's complaint, there were no further eventful catheter changes, although Wesley's chart documents frequent urinary tract infections.[8] (Shelton Decl. Attach. 1, at 1-11.) In March 2015, Wesley was again treated for a urinary tract infection with an antibiotic, Augmentin, to which he has a known drug allergy. (Shelton Decl. ¶ 34.) Wesley was monitored for any allergic reaction for the next several days, and none occurred. (Shelton Decl. ¶¶ 35-37.)

In April 2015, Dr. Gulick submitted a TLC form requesting a specialist urology consultation to evaluate and treat Wesley's recurrent urinary tract infections. (Shelton Decl. ¶ 38.) The TLC Committee approved the consultation, and Wesley attended an appointment with Dr. Glenn Zausmer ("Dr. Zausmer"), a local urologist, on June 15, 2015. (Shelton Decl. ¶¶ 38-39.) Dr. Zausmer recommended an antibiotic bladder wash to help stave off the recurrent urinary tract infections. (*Id.*) Dr. Zausmer also noted that the CT imaging performed that day was "negative for any abnormality of the kidneys, ureter, or bladder." (*Id.*) To date, Wesley continues to have episodic urinary tract infections, but at a rate "usual for individuals with neurogenic bladders." (Shelton Decl. ¶ 40.)

On September 23, 2013, Wesley provided notice of this pending tort claim to the Oregon Department of Administrative Services, Risk Management. (Washington Decl. Ex. 1, at 1-4.) Wesley then filed the present action against Defendants on March 16, 2015. Defendants' motion for summary judgment followed.

---

[8] Wesley asserts that there has been an increase in bladder spasms and urinary tract infections since the March 27, 2013 incident, and believes that these would not have occurred in the absence of the ureteroscopic surgery, but offers no evidence in support of his conclusion. (Wesley Decl. ¶ 78.)

## PRELIMINARY PROCEDURAL MATTERS

### I.    THE DOE NURSES

Defendants argue that Wesley's claims against the Doe nurses should be dismissed because they were not served within the time specified under FED. R. CIV. P. 4(m). (Defs.' Mot. Summ. J. at 10 n.1.) The Court recommends that the district court judge grant Defendants' motion to dismiss the Doe nurses.

If a defendant is not served within ninety days after the complaint is filed, the court must dismiss the action without prejudice against that defendant, or order that service be made within a specified time. FED. R. CIV. P. 4(m). At a Rule 16 case management conference held on September 2, 2015, the parties agreed to an order setting November 2, 2015, as the final date to amend pleadings or add any additional parties or claims. (ECF No. 15.) This order put Wesley on notice, consistent with FED. R. CIV. P. 4(m), that any amended pleading or substitution of parties must be accomplished by November 2, 2016. Wesley did not ask for, and was not granted, an extension of the deadline for amending his pleadings or adding parties. The Doe nurses have not been identified or served, and Wesley has not offered any argument as to why they should remain in this case. Accordingly, the Doe nurses should be dismissed.[9] *See Desantiago v. Oh,* 539 F. App'x 728, 729 (9th Cir. 2013) (affirming dismissal of claims for failure to effect timely service); *McLean v. Shelton,* No. 3:11-cv-01535-AC, 2013 WL 3994760, at *8 (D. Or. Aug. 2, 2013) (dismissing Doe defendants who were not timely served).

---

[9] Any future reference to "Defendants" refers only to Dr. Gulick, Nurse Neill, and Dr. Shelton.

## II.    SERVICE OF PROCESS

Defendants also move to dismiss Wesley's complaint for insufficient service of process, pursuant to FED. R. CIV. P. 12(b)(5). As explained below, the Court recommends that the district court judge deny Defendants' motion to dismiss the complaint on this ground.

"Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999). The court cannot exercise authority over a defendant who has not been properly served. *Beyer v. Moynihan*, No. CV 10-523-MO, 2010 WL 4236871, at *2 (D. Or. Oct. 19, 2010).

FED. R. CIV. P. 4 allows Wesley to serve the named defendants in one of four ways: (1) by delivering a copy of the summons and complaint to the individual personally; (2) by leaving a copy of each at the individual's usual place of abode with someone of suitable age and discretion who resides there; (3) by delivering a copy of each to an agent authorized by appointment or by law to receive the service for the defendant; or (4) by following state law for service in the state courts where the district court is located or where service is made. However, "Rule 4 is a flexible rule that should be liberally construed so long as a party received sufficient notice of the complaint." *Direct Mail Specialists, Inc. v. Eclat Computerized Tech., Inc.*, 840 F.2d 685, 688 (9th Cir. 1988) (citation omitted).

In this district, service is proper if it satisfies service requirements under Oregon law. FED. R. CIV. P. 4(e)(1). Oregon law allows service by leaving a copy of the summons and complaint at the party's office with a person apparently in charge. OR. R. CIV. P. 7D(2)(c); OR. R. CIV. P. 9B. Oregon also allows service to be made in any manner reasonably calculated to apprise a defendant of a pending action and provide the defendant an opportunity to appear. OR. R. CIV. P. 7D(1). Thus, service is presumptively valid if it was "reasonably calculated, under all

PAGE 12 – FINDINGS AND RECOMMENDATION

the circumstances, to apprise the defendant of the existence and pendency of the action."

*Williams v. Jett*, 54 P.3d 624, 625 (Or. Ct. App. 2002).

Dr. Gulick, Nurse Neill, and Dr. Shelton are ODOC employees who work at SRCI. (Pl.'s Resp. Mot. Summ. J. at 16.) On April 10, 2015, Wesley's attorney mailed four copies of the summons and complaint by first class mail to SRCI's address in Ontario, Oregon. A copy was addressed to each of Dr. Gulick, Nurse Butler, Nurse Neill, and Dr. Shelton. (Burrows Decl. Ex. 5-8.) That same day, a process server arrived at SRCI's administration building, which is the only building on SRCI's campus a process server may access independently. (Pl.'s Resp. Mot. Summ. J. at 16.) The process server requested to speak with the individual who could accept a summons and complaint on behalf of SRCI employees. (*Id.*) The receptionist summoned Jill Curtis ("Curtis"), SRCI's Legal Information Officer ("LIO"), to the reception area. (Curtis Decl. ¶ 5.) In her LIO capacity, Curtis serves as a liaison on inmate-related legal issues and tort claims, tracks specific lawsuits and legal activity, and interacts with the Attorney General, legal representatives, and the courts. (Curtis Decl. ¶ 4.) Despite Curtis' protests that she could not accept service, the process server handed Curtis four copies of the summons and complaint. (Curtis Decl. ¶ 5.) Curtis did not advise the process server of other personnel authorized to accept service, and would not or could not allow the process server to serve the individual defendants. (Pl.'s Resp. Mot. Summ. J. at 16.) Curtis was left holding the copies as the process server walked out of the lobby. (Curtis Decl. ¶¶ 6-7.)

A defendant completes office service under Oregon law by leaving copies of the summons and complaint at an office "during normal working hours with the person who is apparently in charge." Or. R. Civ. P. 7D(2)(c). However, the plaintiff, must also "as soon as reasonably possible, . . . cause to be mailed by first class mail true copies of the summons and

the complaint to the defendant at defendant's dwelling house or usual place of abode or

defendant's place of business or any other place under the circumstances that is most reasonably

calculated to apprise the defendant of the existence and pendency of the action, together with a

statement of the date, time, and place at which office service was made." *Id.*

The process server requested to see an individual who could accept service of process for

the named individuals, and the receptionist recognized Curtis as being "apparently in charge" for

the purpose of handling legal materials.[10] (Pl.'s Resp. Mot. Summ. J. at 16.) SRCI was an office

maintained for Defendants' conduct of business, and Dr. Gulick, Nurse Neill, and Dr. Shelton

were ODOC employees at all material times. (Answer ¶¶ 1-4.) Plaintiff mailed copies by first

class mail to the Defendants at SRCI, although the copies did not contain a statement of the date,

time, and place at which office service was made. (*See* Burrows Decl. Ex. 5-8.) Accordingly,

office service on the named defendants was not presumptively valid under Oregon law. *See*

*Johnston v. ADT LLC*, No. 3:15-cv-01396-SI, 2015 WL 7722415, at *4 (D. Or. Nov. 30, 2015)

("[O]ffice service is only complete after the plaintiff sends by first class mail a copy of the

summons and complaint to the defendant's place of business together with a statement of the

date, time, and place at which office service was made.").

Where a plaintiff does not effect service using a presumptively valid method, the Court

must examine whether service was made in any manner reasonably calculated to apprise a

defendant of the pending action, and that provides the defendant an opportunity to appear. The

Court notes that Dr. Gulick, Nurse Neill, and Dr. Shelton worked at SRCI. Ms. Curtis was

---

[10] Defendants assert that service was insufficient because Curtis is not an agent authorized by appointment or by law to receive service for individual ODOC employees. (Defs.' Mot. Summ. J. at 2.) Under Oregon law, a person receiving documents during office service must be "apparently in charge," but need not be authorized to accept service by appointment or law.

apparently in charge of legal matters at SRCI, but even if she was not, she was familiar with the legal protocol for inmates at SRCI and with any system in place to contact employees. She would also know the appropriate individuals to whom she should direct the copies of the summons and complaint, and the date, time, and place at which office service was attempted. In light of these circumstances, the Court concludes that service was reasonably calculated to apprise Dr. Gulick, Nurse Neill, and Dr. Shelton of the pending action and to provide each of them an opportunity to appear.

The Court finds that service was proper under OR. R. CIV. P. 7D(1), and therefore it was also proper under FED. R. CIV. P. 4(e)(1). The district judge should deny Defendants' motion to dismiss the complaint for insufficient service of process.

## III.    WESLEY'S MOTION TO STRIKE

Wesley also moves the Court to strike Defendants' motion for summary judgment and Dr. Shelton's declaration. For the reasons explained below, the district court judge should deny Wesley's motion to strike.

### A.    Local Rule 7-1

Wesley asks the Court to strike Defendants' motion for summary judgment because counsel failed to confer in accordance with Local Rule 7-1. (Pl.'s Resp. Mot. Summ. J. at 9.) "The obvious purpose of Local Rule 7-1(a) is to encourage parties to resolve disputes amicably when possible, preserving judicial resources for those matters that require the court's intervention." *Thompson v. Federico*, 324 F. Supp. 2d 1152, 1172 (D. Or. 2004). The Court may deny any motion that fails to meet this certification requirement. LR 7-1(a)(3).

Defendants certified compliance with Local Rule 7-1 in their motion, but Wesley's counsel claims that Defendants' counsel only "attempted to confer" by email and telephone. Wesley's counsel takes issue with the fact that the attempt to confer was "a single voicemail" the

day before the motion was filed, and a single email twelve hours before the motion was filed. (Pl.'s Resp. Mot. Summ. J. at 9.) Wesley's counsel maintains that "[s]imply telling the other side you are filing something does not meet the conferral requirement." (Pl.'s Resp. Mot. Summ. J. at 9.)

In *Bossert v. Williams*, No. 3:11-cv-03044-AC, 2013 WL 4083593, at *5 (D. Or. Aug. 9, 2013), the plaintiff received a phone call from the defendants "merely stat[ing] which actions they intended to take." The plaintiff argued that, because the defendants "did not propose a possible resolution, or attempt to see if there were some alternative" to trial, defendants failed to confer according to Local Rule 7-1. *Id.* In that case, the court reiterated its "strong judicial policy in favor of non-judicial conflict resolution," but also clarified that Local Rule 7-1 does not require that a moving party try to settle a case during conferral. *Id.* A moving party need only "inform the non-movant of the issues in the motion to be filed to determine whether those issues may be resolved without the assistance of the court." *Id.*

On November 13, 2016, Defendants' counsel left a voicemail message at Wesley's counsel's office. (Pl.'s Resp. Mot. Summ. J. at 9.) Defendants' counsel also sent an email to Wesley's counsel later that evening. (Burrows Decl. Ex. 33, at 1.) In the email, Defendants' counsel lists the grounds for the summary judgment motion, and asks Wesley's counsel to confirm whether she objects to the dispositive motion. Wesley's counsel ignored the call and the email, but now complains about a lack of conferral. The Court finds that Defendants complied with Local Rule 7-1 by attempting to confer via telephone and following up via email, and the district judge should deny Wesley's motion to strike on this ground.

## B.    Dr. Shelton's Declaration

Wesley also moves to strike Dr. Shelton's declaration on the ground that it "notes only the most favorable parts of Mr. Wesley's chart" and "omits entire entries and observations which

are contrary." (Pl.'s Resp. Mot. Summ. J. at 11.) Wesley claims that Dr. Shelton's declaration is "self-serving" with "questionable probative value." (*Id.*) The Court recommends that the district judge deny Wesley's motion to strike.

The Ninth Circuit has acknowledged that declarations are often self-serving by their very nature. Indeed, any party submitting a declaration properly may use the declaration to support his or her position. *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (citing *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007)). Courts may disregard a self-serving and uncorroborated declaration when the declaration is based on facts beyond the declarant's personal knowledge. *Miller v. Multnomah Cty.*, 3:11-CV-1168-AC, 2015 WL 3507949, at *10 (D. Or. June 3, 2015) (citing *Phan*, 500 F.3d at 909-10). However, a district court may not disregard evidence at the summary judgment stage based solely on its self-serving nature. *Phan*, 500 F.3d at 909.

Dr. Shelton based his declaration on a combination of personal and professional knowledge, and in reliance on Attachment 1. (Shelton Decl. ¶ 2.) Attachment 1 includes Wesley's ODOC medical records. There is nothing improper about referring to medical records but highlighting in the declaration those sections that support the declarant's position.

Wesley also moves to strike Dr. Shelton's declaration on the ground that it is inadmissible. To survive a motion for summary judgment, a party does not necessarily have to produce evidence in a *form* that would be admissible at trial, so long as the party satisfies the requirements of FED. R. CIV. P. 56. *Block v. City of Los Angeles*, 253 F.3d 410, 418-21 (9th Cir. 2001); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

PAGE 17 – FINDINGS AND RECOMMENDATION

A declaration used to support or oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated. FED. R. CIV. P. 56(c)(4). Dr. Shelton submitted a signed, sworn affidavit attesting to personal and professional knowledge of the facts set forth in his declaration. As ODOC's Medical Director, Dr. Shelton is competent to testify about medical treatment provided to inmates housed at ODOC, and the factual content of his declaration is relevant because it influences the probability that Defendants were or were not deliberately indifferent or medically negligent. For these reasons, the Court concludes that Dr. Shelton's declaration satisfies the requirements of FED. R. CIV. P. 56, and the district judge should deny Wesley's motion to strike.

## IV.    DEFENDANTS' MOTION TO STRIKE

Defendants move to strike pages thirty-six through sixty-seven of Wesley's response brief because Wesley's counsel failed to request leave to exceed the page limit imposed by the Local Rules. Although Wesley did not request permission to file the over-length brief, and the brief was *substantially* longer than the length allowed by the Local Rules, the Court recommends that the district judge consider Wesley's response brief in its entirety and decline to strike pages thirty-six through sixty-seven.

Local Rule 7-2(b)(1) limits non-discovery motions to thirty-five pages in length unless the party submitting the motion requests permission from the court. LR 7-2(b)(1). Local rules, such as those governing the length of briefs, seek to avoid an unnecessary burden on the court. *Smith v. Frank*, 923 F.2d 139, 142 (9th Cir. 1991). A district court has wide discretion in applying its own local rules. *See U.S. v. Warren*, 601 F.2d 471, 474 (9th Cir. 1979) ("Only in rare cases will we question the exercise of discretion in connection with the application of local rules.").

PAGE 18 – FINDINGS AND RECOMMENDATION

In *King County v. Rasmussen*, the Ninth Circuit affirmed the district court's decision to strike the pages of two response briefs that exceeded the page limits under local rules. 299 F.3d 1077, 1082 (9th Cir. 2002). The Ninth Circuit noted that the material struck from the response briefs did not necessarily affect its *de novo* review of the summary judgment motion because it "must consider the effect of any case relevant to the arguments raised," regardless of whether parties briefed those cases. *Id.*; *see also U.S. v. Lund*, No. 11-6237-AA, 2012 WL 425942, at *3 (D. Or. Feb. 8, 2012) (noting that the court was only required to examine the first thirty-five pages of a *pro se* respondent's 111-page brief, but nevertheless considering the brief in its totality in the interest of fairness).

Defendants object to the Court's consideration of Wesley's excessive briefing. However, the material included in pages thirty-six through sixty-seven of Wesley's response: (1) largely restates facts and allegations already contained in other pleadings and declarations, and (2) includes a summary of relevant cases that this Court would consider regardless of whether it struck the extra pages. Although the Court finds that the excessive briefing created an unnecessary burden here, the Court recommends that the district judge deny Defendants' motion to strike pages thirty-six through sixty-seven.[11]

## V.    STATUTE OF LIMITATIONS

Defendants move the Court to dismiss Wesley's claims as time-barred, to the extent that the claims relate to the May 2010 catheter change. The Court recommends the district court judge grant Defendants' motion to dismiss on this ground.

Wesley argues that the May 2010 incident set off an "uninterrupted course of conduct" and a failure to treat that has continued throughout his incarceration, and, as such, resulted in

---

[11] In the future, this Court will strike any over-length filings at the time of filing, with leave to refile a brief that conforms with our Local Rules.

continuing violations. (Pl.'s Resp. Mot. Summ. J. at 60.) A continuing violation or continuing tort occurs when a series of wrongful acts of the same nature causes the alleged harm, rather than attributing the harm to a specific act within the larger pattern of wrongful conduct. *Flowers v. Carville,* 310 F.3d 1118, 1126 (9th Cir. 2002) (citing *Page v. U.S.,* 729 F.2d 818, 821 (D.C. Cir. 1984)). The doctrine does not apply when a plaintiff's claims are based on discrete acts. *Singh v. Washburn*, 2:14-CV-01477-SB, 2016 WL 1039705, at *7 (D. Or. Feb. 5, 2016).

Here, the facts that Wesley sets forth in his declaration to support his continuing violations argument are contradicted by Wesley's ODOC medical records. According to Wesley's ODOC medical records, thirty-seven of thirty-nine routine catheter changes during the relevant time period in question were uneventful, and thirty-five of thirty-nine routine catheter changes were performed within the prescribed thirty-day period. In addition, Wesley's chart documents numerous infirmary visits wherein ODOC medical personnel diagnosed and treated a variety of symptoms and issues in a timely manner, as they occurred. Wesley's argument that his treatment at SRCI was an uninterrupted course of bad acts that should be considered as continuing violations to avoid the statute of limitations, is not supported by the record. Therefore, the Court examines the May 2010 incident as a discrete act.[12]

The Oregon Tort Claims Act ("OTCA") requires that a plaintiff provide notice of a tort claim to the relevant public body within 180 days of the date a plaintiff knows, or should know,

---

[12] Wesley also alleges that Defendants falsified his medical records by "writing information in the record to conflict with what actually happened." (Wesley Decl. ¶ 47.) A plaintiff "cannot create a genuine issue of fact simply by proffering conclusory allegations" that Defendants are lying. *McKenzie v. Jorizzo*, No. 1:13-cv-1302-AA, 2015 WL 127826, at *5 n.3 (D. Or. Jan. 6, 2015). Although the Ninth Circuit has held that "[s]pecific testimony by a single declarant can create a triable issue of fact," courts may disregard a declaration when the declaration is conclusory or is based upon facts beyond the declarant's personal knowledge. *Fed. Trade Comm'n v. Neovi*, 604 F.3d 1150, 1159 (9th Cir. 2010); *Phan*, 500 F.3d at 909-10.

that "he or she has suffered some harm and knows that it is the result of tortious conduct." OR. REV. STAT. § 30.275(2)(b); *Doe v. Lake Oswego Sch. Dist.*, 353 Or. 321, 335 (2013). The Oregon Department of Administrative Services, Risk Management Division ("Risk Management"), is the relevant public body to receive the required notice. (Defs.' Mot. Summ. J. at 12.) In addition to the OTCA requirements for Wesley's tort claim, a two-year statute of limitations applies to Wesley's Section 1983 claim. *Sain v. City of Bend*, 309 F.3d 1134, 1135-36 (9th Cir. 2002) (applying two-year statute of limitations set forth at Or. Rev. Stat. § 12.110 to Section 1983 claims).

Risk Management received Wesley's tort claim notice on September 30, 2013. (Washington Decl. ¶ 4.) It is not disputed that Wesley knew of any harm arising from the May 2010 catheter change in May 2010; thus, he was required to submit the tort claim notice to Risk Management no later than November 2010. Wesley filed a notice with the Oregon State Board of Nursing in December 2010 (Wesley Decl. ¶ 27), which is not the appropriate public body to serve and, in any event, his notice was untimely. In addition, Wesley filed this action on March 16, 2015, which was well beyond the two-year period in which to challenge the May 2010 catheter change. Accordingly, the district judge should dismiss as time-barred Wesley's claims as they relate to the May 2010 catheter change.

## ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005) (citations omitted). The court does not assess

PAGE 21 – FINDINGS AND RECOMMENDATION

the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue

for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation

omitted). Where a nonmoving party provides facts that are "blatantly contradicted by the record,

so that no reasonable jury could believe it," the nonmoving party's version of facts is not

summarily adopted in ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372,

380 (2007).

## II.    DISCUSSION

Defendants argue that they are entitled to summary judgment on Wesley's Eighth

Amendment and state medical negligence claims because there is no genuine issue of material

fact as to whether: (1) Defendants were deliberately indifferent to Wesley's serious medical

needs, or (2) Defendants acted negligently. As explained below, the Court recommends that the

district judge grant Defendants' motion for summary judgment.

### A.    First Claim for Relief (Eighth Amendment)

"A public official's 'deliberate indifference to a prisoner's serious illness or injury'

violates the Eighth Amendment ban against cruel punishment." *Clement v. Gomez*, 298 F.3d 898,

904 (9th Cir. 2002) (quoting *Estelle v. Gamble,* 429 U.S. 97, 105 (1976)). To prevail on an

Eighth Amendment deliberate indifference claim, "an inmate must demonstrate that . . . officials

had a 'sufficiently culpable state of mind' in denying the proper medical care." *Id.* (quoting

*Wallis v. Baldwin,* 70 F.3d 1074, 1076 (9th Cir. 1995)). The Ninth Circuit has held that "[a]

determination of 'deliberate indifference' involves an examination of two elements: (1) the

seriousness of the prisoner's medical need and (2) the nature of the defendant's response to that

need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by*

PAGE 22 – FINDINGS AND RECOMMENDATION

*WMX Techs, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). The nature of a defendant's response is deliberately indifferent if the prisoner can show (a) a purposeful act or failure to respond to the prisoner's pain or medical need; and (b) harm caused by the indifference. *Id.* at 1059-60 (citing *Estelle*, 429 U.S. at 104). Indifference "may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.*

### 1.    Serious Medical Need

An inmate must first demonstrate that he suffered an objectively serious illness or injury while incarcerated. *Clement*, 298 F.3d at 904-05. A medical need is serious if the failure to treat an inmate's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104. It is undisputed that Wesley is a T4/T5 paraplegic who requires special care. He has additional chronic health care needs that, if inadequately met, result in the "unnecessary and wanton infliction of pain," such as urinary tract infections and symptomatic autonomic dysreflexia. Thus, Wesley has established that he has an objectively serious medical need.

### 2.    Deliberate Indifference

"[D]eliberate indifference is a high legal standard. A showing of medical malpractice or even gross negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *McKenzie*, 2015 WL 127826, at *7 (quoting *Toguchi v. Chung*, 391 F. 3d 1051, 1058 (9th Cir. 2004) (internal brackets omitted)). The Eighth Amendment is not a vehicle for bringing medical malpractice claims, and not every lapse in a prisoner's medical care will rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 105-06. "An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Id*. at 105.

PAGE 23 – FINDINGS AND RECOMMENDATION

Furthermore, "mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." *Toguchi*, 391 F.3d at 1057 (quoting *McGuckin,* 974 F.2d at 1059). "A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014) (citing *Snow v. McDaniel,* 681 F.3d 978, 987 (9th Cir. 2012)).

### a.    Denying or Delaying Access to Medical Care

Wesley alleges that Defendants were deliberately indifferent to his serious medical needs when they denied him access to routine medical care from qualified medical personnel, such as having a urologist perform his monthly catheter changes. He also asserts that, when routine medical care did occur, it was delayed, which led to repeated secondary infections and symptomatic autonomic dysreflexia.

The record reflects that during his time in ODOC custody, Wesley has been attended by multiple medical doctors and registered nurses, all of whom are state-licensed. He has also had access through timely TLC Committee approval to non-ODOC providers, such as Dr. Klein and Dr. Zausmer. According to Wesley's ODOC medical records, thirty-seven of thirty-nine routine catheter changes during the period in question were uneventful, and thirty-five of thirty-nine routine catheter changes were performed within the prescribed thirty-day period. Dr. Klein, a non-ODOC urologist who treated Wesley, is of the opinion that the catheter changes "can certainly be done at the correctional institution." (Burrows Decl. Ex. 39, at 5.)[13] Thus, qualified

---

[13] In addition, Dr. Shelton testified that: "The community standard [for catheter changes] is mostly the person self does it, if they can. Otherwise, a family member does it with some training. It's not a physician procedure. It's a home procedure . . . . Standard of care is having it done on site [at an ODOC facility]." (Burrows Decl. Ex. 32, at 26:9-16.)

PAGE 24 – FINDINGS AND RECOMMENDATION

medical personnel performing Wesley's catheter changes in the SRCI infirmary is consistent
with the community standard of care.

Wesley's claim that Defendants denied him access to routine medical care from qualified
medical personnel, or that such medical care was consistently delayed, is unsupported by the
record. No reasonable juror could conclude that Defendants were deliberately indifferent to
Wesley's serious medical needs on this ground.

**b.    Intentional Interference with Treatment**

Wesley also alleges that Defendants were deliberately indifferent to his serious medical
needs by failing to address emergent medical needs in a timely and medically acceptable manner
in connection with the March 27, 2013 catheter change and its aftermath, and when they
prescribed known drug allergens for treatment of his urinary tract infections. A difference of
opinion between a physician and the inmate does not amount to deliberate indifference unless the
plaintiff demonstrates that the prison doctors chose a course of treatment that was "medically
unacceptable under the circumstances," and that such a choice was made "in conscious disregard
of an excessive risk to plaintiff's health." *Colwell*, 763 F.3d at 1068 (citing *Snow*, 681 F.3d at
987). Wesley has not made such a showing here.

First, for the reasons discussed below, Wesley has failed to produce sufficient evidence to
support a negligence claim resulting from Nurse Neill's March 27, 2013 catheter change, let
alone to support a finding that any of the Defendants acted with gross negligence or deliberate
indifference to his serious medical needs. Instead, the record reflects that once the medical
providers became aware that there was a problem with the March 27, 2013 catheter insertion, Dr.
Gulick advised Nurse Kimball to arrange for Wesley to go to the SAMCO emergency room.
Wesley's urgent ureteroscopic surgery was approved by the TLC committee the morning
following his SAMCO emergency room visit, and the surgery itself took place the following

PAGE 25 – FINDINGS AND RECOMMENDATION

afternoon. Given these facts, Wesley has failed to demonstrate that Defendants chose a course of treatment that was "medically unacceptable under the circumstances," or that they were not timely in their decision-making.[14]

Second, there are limited antibiotics available to treat antibiotic-resistant bacteria, such as those shown in Wesley's urine cultures. (Shelton Decl. ¶ 18.) Such a restriction leaves ODOC physicians with the difficult choice of providing Wesley with no treatment at all for his urinary tract infections, or treatment with a known drug allergen followed by monitoring for any signs of an allergic reaction. (*Id.*) The record is clear that medical staff monitored Wesley after administering known drug allergens, and that Wesley did not experience any allergic reactions. A difference of opinion between Wesley and ODOC physicians and nurses regarding medically acceptable treatment for his urinary tract infections is insufficient to establish deliberate indifference under the law.

The record supports a conclusion that the March 27, 2013 catheter issue was accidental, and that Wesley's medical providers responded in a timely and appropriate manner. Wesley has not submitted any evidence to support a conclusion that Defendants were deliberately indifferent to his serious medical needs in connection with that catheter change, or his routine medical care. For these reasons, the Court recommends that the district judge grant summary judgment in favor of Defendants on Wesley's Eighth Amendment claim.[15]

---

[14] Similarly, although any claims relating to the May 2010 catheter change are time-barred, the record reflects that when Wesley developed symptomatic autonomic dysreflexia, an ODOC nurse practitioner administered nitroglycerin tablets within minutes to bring Wesley's blood pressure down, and he was transported to the closest hospital by ambulance for emergency treatment.

[15] In light of these findings, the Court does not address Defendants' argument that they are entitled to granted summary judgment on the ground of qualified immunity.

**B.      Second Claim for Relief (Medical Negligence)**

Wesley also alleges that Defendants were medically negligent in connection with the events surrounding his catheter insertions. Wesley claims that Defendants' actions violated the "known medical standards of care" (Compl. ¶ 52.) However, Wesley has not submitted any expert or other medical evidence to demonstrate a material issue of fact regarding the appropriate standard of care, or that Defendants breached the standard of care, and therefore he has not met his burden to survive summary judgment.

In a medical negligence claim under Oregon law, a medical provider's "duty of care is measured by the standard of care in the community." *Johnson v. Westermeyer*, No. 3:11-cv-00514-ST, 2014 WL 2807667, at *9 (D. Or. June 19, 2014). A medical provider is required "to exercise that degree of care, knowledge and skill ordinarily possessed and exercised by the average provider of that type of medical service." *Curtis v. MRI Imaging Servs. II*, 327 Or. 9, 14 (1998). "In most charges of negligence against professional persons, expert testimony is required to establish what the reasonable practice is in the community[,]" unless "the jury is capable of deciding what is reasonable conduct without assistance from an expert medical witness[.]" *Id.* (citing *Getchell v. Mansfield*, 260 Or. 174, 179-80 (1971)); *see also Cook v. United Airlines, Inc.*, No. CV 08-3073-CL, 2009 WL 1727854, at *3 (D. Or. June 17, 2009) (noting that under Oregon law, "'[i]f the issue turns upon some fact beyond the ken of laymen, expert testimony must be produced'" at the summary judgment stage).

In support of their motion for summary judgment, Defendants submitted Dr. Shelton's declaration, in which he opines, based upon his professional medical opinion and his review of Wesley's medical records, that the "incident of March 27, 2013, in which the tip of the Foley catheter became lodged in the left ureter was and is in general an unusual occurrence[,]" that the "incident was a one-time occurrence and once it was discovered, Health Services providers and

staff took immediate action to provide corrective care[,]" that "[n]owhere in the progress notes did the RN state that the catheter was difficult to insert or needed force to be inserted[,]" and that "[i]f the catheter was lodged into the ureter by an RN changing the catheter, it was an accident and not because they were not following procedure or being deliberately indifferent to Inmate Wesley or his medical needs." (Shelton Decl. ¶ 41.) Dr. Shelton concluded that "[t]o a reasonable medical certainty, and based [on] my professional opinion, the Defendants followed the medical standard of care in treating Inmate Wesley." (*Id.* ¶ 42.) Dr. Shelton attached Wesley's medical records to his declaration. (Shelton Decl. Attach 1.)

Wesley did not provide the Court with an expert medical opinion to rebut Dr. Shelton's opinion. For that reason alone, Wesley has not met his burden of demonstrating that a material issue of fact exists as to whether Defendants violated the appropriate standard of care, and summary judgment for Defendants is appropriate. *See Thompson v. Luna*, 441 F. App'x 528, 529 (9th Cir. 2011) (holding that the "district court properly granted summary judgment on [the plaintiff's] state law claims because [the plaintiff] failed to rebut with expert medical testimony defendants' showing that they met the appropriate standard of care . . . ."); *Turner v. Multnomah Cty.*, No. 3:12-cv-01851-KI, 2015 WL 3492705, at *12 (D. Or. June 3, 2015) (granting summary judgment to the defendants on the plaintiff inmate's medical negligence claims where the plaintiff did not "offer an opinion about what the nursing standard of care is in the correctional environment, [or] explain how [the nurse] breached that standard of care]."); *Johnson*, 2014 WL 2807667, at *9 (granting summary judgment to the defendant on the plaintiff's medical negligence claim based upon defendant's unrebutted declaration stating that he met the appropriate standard of care in treating the plaintiff); *Cook*, 2009 WL 1727854, at *3 (granting the defendant's motion for summary judgment on the plaintiff's medical negligence claim where

the plaintiff relied only upon her medical records and own self-diagnosis at summary judgment);

*Swanson v. Coos Cty.*, Civ. No. 08-6312-AA, 2009 WL 5149265, at *5 (D. Or. Dec. 22, 2009)

(granting the defendants' motion for summary judgment on the plaintiff's medical malpractice

claim where the defendant physician submitted expert testimony that the plaintiff's care was

consistent with the accepted standard of care in the community and the plaintiff did not respond

with any evidence or expert testimony to rebut the defendant's assertion).

 Even if the Court were to find that medical expert testimony is not required here, Wesley

has nevertheless failed to produce sufficient evidence to meet his burden of demonstrating the

appropriate standard of care, or that Defendants breached that standard of care. In opposing

Defendants' motion for summary judgment, Wesley relies on his medical records, the deposition

testimony of his SRCI treatment providers, and his own declaration describing his version of

events on March 27, 2013. (Wesley Decl. ¶¶ 40-77.) The Court will carefully examine each

source of medical evidence to determine if Wesley has met his burden of demonstrating that an

issue of material fact exists for trial.

 Wesley's medical negligence claim rests primarily on his assertion that Nurse Neill

improperly inserted his catheter on March 27, 2013, and that she should have known that there

was a problem with the insertion. Specifically, Wesley alleges that Nurse Neill "should have

known there were problems when she could not inflate [the balloon.]" (Pl.'s Resp. Mot. Summ.

J. at 34.) In support of his argument that Nurse Neill should have known there was a problem

when the balloon did not inflate to its normal volume, Wesley cites to four medical records, as

described below:

- In Exhibit 10, Dr. Uhlman (a local urologist) notes that the catheter "was errantly
placed in the patient's left distal ureter."

- Exhibit 11 includes Dr. Uhlman's post-operative orders, which do not appear to include any discussion of the catheter placement.

- Exhibit 23 includes the St. Alphonsus Medical Center notes dated March 27, 2013, indicating that Wesley's catheter was changed because it "wasn't draining."

- Exhibit 24 includes St. Alphonsus Medical Center notes dated March 27, 2013, including the CT scan report which indicated that the "suprapubic Foley catheter is positioned through the abdominal wall into the urinary bladder. However, the catheter courses across the left ureterovesical junction into the distal left ureter resulting in acute high grade obstruction of the distal left ureter" and diagnosing "[a]cute high grade left renal obstruction secondary to iatrogenic malpositioned suprapubic Foley catheter, the distal tip positioned within the distal left ureter."

(Burrows Decl. Exs. 10-11, 23-34.) There appears to be no factual dispute that the catheter ended up in Wesley's left ureter, instead of his bladder, following Nurse Neill's March 27, 2013 insertion. Viewing the disputed facts in a light most favorable to Wesley, the catheter ended up in his left ureter as a result of Nurse Neill's improper insertion (although there is also support in the record for a conclusion that the catheter "wandered" or "floated" to the left ureter following insertion).[16] However, these medical records do not provide support for Wesley's allegation that Nurse Neill deviated from the appropriate standard of care in inserting the catheter, or that a reasonable nurse should have realized that there was a problem with the insertion. Thus, the medical records upon which Wesley relies do not satisfy his burden at summary judgment.

---

[16] In a March 28, 2013 chart note, Dr. Bristol indicates that he referred Wesley to surgery because his "chronic indwelling catheter wandered into the ureter." (Shelton Decl. Attach 1, at 74-75.) When asked how the catheter ended up in Wesley's left ureter, Dr. Shelton referenced the CT scan of Wesley's pelvis and testified that the catheter "floated over there" to the ureter, and that the catheter insertion was "not improper." (Burrows Decl. Ex. 32, at 52:16, 52:21.)

Wesley also seeks to rely on the deposition testimony of Dr. Bristol, an SRCI treatment provider. During the deposition, Wesley's counsel asked Dr. Bristol if four cubic centimeters of saline would be "be something of a warning to you" if a balloon normally accepts six cubic centimeters of saline. (Burrows Decl. Ex. 29, at 24:7-15.) Dr. Bristol responded that "[i]t would make me stop and think what's going on[,]" and he "*might* want to deflate and move the catheter and readjust." (*Id.* at 24:16-25 (emphasis added).) Notably, Dr. Bristol goes on to testify that "the difference between four cc's and six cc's is less than a teaspoon[;] [i]t's a small difference." (*Id.* at 25:7-8.) He also clarified that he was not making any conclusions regarding "causality." (*Id.* at 38:25.) Although Dr. Bristol testified that a balloon accepting less than the normal volume of saline "might" cause him to readjust the catheter (with the caveat that the difference between four and six cubic centimeters is only a teaspoon), he did not opine on the appropriate standard of care or whether a reasonable nurse should have known that there was a problem with the insertion. Thus, Dr. Bristol's testimony does not satisfy Wesley's burden at summary judgment.

Wesley also seeks to rely on his own declaration. In his declaration, Wesley asserts that Nurse Neill inserted the catheter too far, pushed too hard on the syringe, and was unable to fill the balloon to its normal volume. (Wesley Decl. ¶¶ 45-46.) Wesley states that "when she was unable to get more than 4 cc that should have signaled something was wrong" and that "[t]his is not normal and Nurse Neil[l] should have stopped." (Wesley Decl. ¶ 46.) Wesley further states that the emergency room doctor told him that the end of the catheter was inflated inside his left ureter and "in his 30 years of practicing medicine he's never heard of this happening and I should be in a medical journal." (Wesley Decl. ¶ 62.) There appears to be no dispute that the catheter ending up in Wesley's left ureter was an unusual occurrence, but Wesley's own personal conclusion that Nurse Neill should have known something was wrong is not enough to meet his

burden at summary judgment.[17] *See Cook*, 2009 WL 1727854, at *4 (finding that the plaintiff's "allegations have not been validated by experts and appear to be based on her own beliefs and conclusions" and that the plaintiff "has submitted no probative evidence" in support of her negligence claim).

For these reasons, the Court recommends that the district judge grant Defendants' motion for summary judgment on Wesley's medical negligence claim.[18]

## CONCLUSION

For the reasons stated, the Court recommends that the district judge GRANT Defendants' motion for summary judgment (ECF No. 31), and enter judgment in favor of Defendants.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections

---

[17] Wesley also filed Expert Disclosures on June 30, 2016 (ECF No. 25), identifying several "potential expert witnesses in this matter," but he does not rely on this information to oppose Defendants' motion for summary judgment and, in any event, Wesley did not disclose any experts who would testify that Nurse Neill or the other Defendants violated the appropriate standard of care. *See Cook*, 2009 WL 1727854, at *4 (noting that although the plaintiff had identified potential experts, "at the time of filing, Plaintiff did not provide their testimony to support her claim" and "[i]dentifying potential experts is not enough at this stage of the litigation").

[18] If the district judge disagrees and denies Defendants' motion to dismiss Wesley's medical negligence claim, the undersigned recommends that the district judge order the parties to brief the issue of whether the court should exercise supplemental jurisdiction over Wesley's negligence claim despite the dismissal of Wesley's only federal claim. *See Miller*, 2015 WL 3507949, at *14 (entering summary judgment for the defendants on Section 1983 claim and declining to exercise supplemental jurisdiction over the plaintiff's medical negligence and other state law claims); *see also Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) ("The Supreme Court has stated, and we have often repeated, that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point towards declining to exercise jurisdiction over the remaining state-law claims'") (citation omitted).

are filed, a response is due fourteen (14) days after being served with a copy of the objections.

When the response is due or filed, whichever date is earlier, the Findings and Recommendation

will go under advisement.

DATED this 25th day of August, 2017.

_____
STACIE F. BECKERMAN
United States Magistrate Judge